WILLIAM F. QUARRIE, MABLE E. QUARRIE AND MARGARET K. QUARRIE CHARITABLE FUND, the Northern Trust Company, Trustee, Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 78–2089.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 23, 1979.

Decided Aug. 15, 1979.

William P. Sutter, Chicago, Ill., for petitioner-appellant.

Libero Marinelli, Jr., Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before SWYGERT, SPRECHER, Circuit Judges, and NOLAND, District Judge.[*]

SPRECHER, Circuit Judge.

The William F., Mable E. and Margaret K. Quarrie Charitable Fund (The Fund), by its trustee, The Northern Trust Company, (The Trustee), appeals from a Tax Court determination that it is a private foundation as defined by Section 509(a) of the Internal Revenue Code, rather than a supporting organization within the terms of Section 509(a)(3). The sole issue is whether the trustee of The Fund has such discretionary power to substitute beneficiaries as requires denial of supporting organization status.

In 1942 William F. Quarrie created a trust, which became irrevocable on his death in 1956. In 1960 Quarrie's widow Mable, pursuant to powers granted her by the trust instrument, executed a "Designation of Charitable Beneficiaries." The Designation directs that the income from the trust be paid to The Northern Trust Company as trustee of The Fund, and distributed to The Chicago Community Trust, the

---

[*] The Honorable James E. Noland, United States District Court for the Southern District of Indiana is sitting by designation.

Columbia-Presbyterian Medical Center Fund, Inc., and the Art Institute of Chicago. According to the trust instrument Mr. Quarrie's niece receives $1,000 a year from the income of the trust. On her death the principal goes to The Fund and the income is to be paid by The Trustee, in specified shares, to the beneficiaries now receiving the income. According to the Designation, the income distributed to the Chicago Community Trust and to the Columbia-Presbyterian Medical Center is to be used as they "shall deem advisable for the advancement of medical education and research." The crucial terms of the Designation provide that:

> In the event that at some future date, any of the aforesaid charitable uses in the judgment of the Northern Trust Company shall have become unnecessary, undesirable, impracticable, impossible or no longer adapted to the needs of the public, the income otherwise to be devoted to such use shall be distributed to such charitable, scientific, educational or religious corporations, trusts, funds or foundations as the Northern Trust Company may select to be used for their general purposes.

According to the Tax Court this provision requires that The Fund be treated as a private foundation, and not as a supporting organization.

Private foundations were defined and subjected to significant regulations and controls by the Tax Reform Act of 1969. These reforms were prompted by Congressional concern over widespread abuses of the tax-exempt status of private foundations. The 1969 Act imposed on private foundations an excise tax, required that they distribute yearly a minimum percentage of their assets, severely limited the permissible relationship of foundations to their founders or donors, required that they supervise the use made of the funds they distribute, required yearly reports, and exposed them to severe penalties for failure to satisfy these requirements. *See* Internal Revenue Code, §§ 4940 through 4945. The definition of a private foundation is intentionally inclusive: all organizations exempted from tax by Section 501(c)(3)[1] are private foundations except for those specified in Section 509(a)(1) through (4). The exceptions are churches, schools, and hospitals, § 509(a)(1), other publicly supported organizations, § 509(a)(2), and supporting organizations of such excepted organizations.[2] If The Fund were to escape private foundation status and its associated burdens, it would do so as a supporting organization.

■ Public charities were excepted from private foundation status on the theory that their exposure to public scrutiny and their dependence on public support would keep them from the abuses to which private foundations were subject.[3] Supporting or-

---

1. Section 501(c)(3) organizations are:
   Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals . . . .

2. Section 509(a)(3) defines a supporting organization as:
   an organization which—
   (A) is organized, and at all times thereafter is operated, exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more specified organizations described in paragraph (1) or (2) [public charities],
   (B) is operated, supervised, or controlled by or in connection with one or more organizations, described in paragraph (1) or (2), and,
   (C) is not controlled directly or indirectly by

one or more disqualified persons (as defined in section 4946) other than foundation managers and other than one or more organizations described in paragraph (1) or (2) . . . .

3. The statutory definition of 'private foundation' reflects an underlying congressional philosophy which turns upon a very crucial distinction between organizations that are privately financed and those that depend upon the public for their support. In the latter case, the organization is subject to the discipline of public opinion. If it misbehaves, misuses its capital, or engages in questionable practices, the public will presumably learn about it, and by the simple expedient of cutting off contributions, correct that which has become offensive.

   On the other hand, the institution that is privately financed is subject to no such corrective influence and therefore must be regulated in some other way.

ganizations are similarly excepted in so far as they are subject to the scrutiny of a public charity. The Treasury Regulations therefore provide that the supporting organization must be responsive to the needs of the public charity and intimately involved in its operations.[4]

■ This required relationship between a supporting organization and a public charity is described by Section 509(a)(3)(B): the supporting organization must be "operated, supervised, or controlled by or in connection with" a public charity. The interpretive regulations elaborate this as describing three different types of relationship: being 1) operated, supervised, or controlled by, 2) supervised or controlled in connection with, or by, 2) supervised or controlled in connection with, or 3) operated in connection with.[5] Treas.Reg. § 1.509(a)–4(f)(2). It is agreed that The Fund is an organization "operated in connection with" a public charity. Because this is the least intimate involvement of the three sorts of relationship, strict limits are imposed on the structure of an "operated in connection with" organization.

■ The requisite characteristics of a supporting organization are indicated by Section 509(a)(3)(A): it must be

organized, and at all times thereafter . . . operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more specified organizations described in paragraph (1) or (2).

At issue here is the requirement that the beneficiary organization must be specified by name. This requirement is more narrowly drawn for "operated in connection with" organizations, than for the other two sorts.[6]

■ The articles of a supporting organization which is "controlled by" or "controlled in connection with" a publicly supported organization may specify the beneficiary organizations by class, rather than by name, provided that the supporting organization is controlled by a beneficiary of the specified class. Treas.Reg. § 1.509(a)–4(d)(2) and (3). In such circumstances substitution of beneficiaries within the class is permitted, since such substitution is at all times controlled by a publicly supported beneficiary.

■ The articles of a supporting organization such as The Fund, which is merely "operated in connection with" a publicly supported organization must without exception designate the "specified" organizations by name.[7] Since such specified

*The Tax Reform Act of 1969*, (Washington, American Enterprise Institute, 1974), 45–46.

4. *Treasury Regulations on Income Tax* (1954 Code), § 1.509(a)–4(f)(3).

5. The relationship of an "operated, supervised or controlled by" supporting organization to its publicly supported organization is comparable to that of subsidiary to parent. Treas.Reg. § 1.509(a)–4(g). A supporting organization and the publicly supported organization it is "supervised in connection with" must have the same management. Treas.Reg. § 1.509(a)–4(h). An organization like The Fund that is merely "operated in connection with" a publicly supported organization must meet two tests, a responsiveness test, and an integral part test. The first will be met if the supporting organization is a charitable trust, and the named beneficiary can enforce an accounting, or if there is overlap of officers, so that the publicly supported organization has some voice in the operation of the supporting organization. Treas. Reg. § 1.509(a)–4(i)(2). To satisfy the integral part test, the attentiveness of the publicly sup-

ported organization to the operations of the supporting organization must be assured by the nature or magnitude of the supporting organization's contributions. Treas.Reg. § 1.509(a)–4(i)(3).

6. "The manner in which the publicly supported organizations must be 'specified' in the articles for purposes of section 509(a)(3)(A) will depend upon whether the supporting organization is 'operated, supervised, or controlled by' or 'supervised or controlled in connections with' . . . such organizations or whether it is 'operated in connection with' . . . such organizations." Treas.Reg. § 1.509(a)–4(d)(1).

7. The only exception to this requirement is provided by Treas.Reg. § 1.509(a)–4(d)(2)(iv), excusing supporting organizations whose relationship with their beneficiary has been so historic and continuous that "a substantial identity of interests" has developed. This exception makes clear that the purpose of the required specification is to guarantee not only close su-

organizations may in time dissolve, substitution is permitted. The possible substitutes must be named too. They may be designated by class, rather than by name, but only if:

> such substitution is conditioned upon the occurrence of an event which is beyond the control of the supporting organization, such as loss of exemption, substantial failure or abandonment of operations, or dissolution of the publicly supported organization or organizations designated in the articles.

Treas.Reg. § 1.509(a)–4(d)(4)(i)(a). The issue in this appeal is whether the Tax Court properly found that The Fund fails to satisfy this regulation due to the power given to The Trustee to substitute beneficiaries when, in its judgment, the uses of the named beneficiaries "shall have become unnecessary, undesirable, impracticable, impossible or no longer adapted to the needs of the public."

The Trustee argues first that the Designation satisfies the requirements of the regulation, since The Trustee cannot control events in such a way as to make a charitable use such as the advancement of medical education and research "unnecessary, undesirable, impracticable, etc." According to the Designation, however, the factor permitting substitution is not the undesirability of the charitable use, but The Trustee's judgment that the use has become undesirable. Becoming undesirable may not be an event within The Trustee's control, but the act of judgment is an event that is within his control. The Designation would permit a trustee to withhold his judgment that a charitable use had become undesirable, despite substantial contrary opinion, and similarly permits him to make such a judgment.

The Trustee argues that the Regulations themselves permit the exercise of similar discretion when they give, as an illustration of an event beyond the supporting organization's control, "substantial failure or abandonment of operations" by the specified beneficiary organization. Certainly, a determination that substantial failure has occurred would involve an exercise of judgment. But substantial failure is also more objective than undesirability. The more objective the event, the less subjective is the judgment involved in determining its occurrence. In a finding of undesirability there remains a degree of irreducible, imprecise, subjective judgment not found in the formulae, such as "substantial failure," approved by the IRS. By permitting a supporting organization to exercise some limited judgment in determining that the event on which substitution is conditioned has occurred, the IRS has not obligated itself to accept any greater degree of subjectivity. It is not unreasonable to draw a line between "substantial failure" and "undesirability."[8]

The Trustee also argues that the exercise of his discretion is subject to the control of the beneficiary organizations, and the Attorney General of Illinois, who under State law have the power to police the exercise of his judgment.[9] This power would enable a charitable trust to satisfy the responsiveness test which an "operated in connection with" organization must meet. Treas.Reg. § 1.509(a)–4(i)(2)(iii). However, the requirement that an "operated in connection with" organization specify its beneficiaries is intended to secure more than just supervision by the beneficiary. The organizational test which all supporting organizations must meet aims at a close

---

pervision of the supporting organization by the beneficiary publicly supported organization, but also a close identification of one with the other.

8. The crucial issue is not whether the event on which substitution is conditioned is subjective or objective, but who determines that the event occurred. The Regulations imply that the more subjective the event, the less is the judgment to be left with the trustee. This is not to say that substitution may not be conditioned on a subjective event like undesirability, but that if it is, the judgment that the charitable use has become undesirable cannot be left to the trustee. It might be acceptable, however, if such a determination were delegated to an independent body. *See* the discussion of Community Trusts, below, p. 11.

9. *See* the Illinois Charitable Trust Act, Ill.Rev. Stat. Ch. 14, §§ 51–64.

identification of the supporting organization with its beneficiary. Treas.Reg. § 1.509(a)–4(c).[10] A supporting organization is to be linked to a specific public organization. If the linkage is by ownership or mutual control the beneficiary organization need not be named. Treas.Reg. § 1.509(a)–4(d)(2), see discussion above, p. 5. The relationship itself establishes the identification. Where the linkage is pragmatic, however, based on the magnitude of the support and the beneficiary's related dependence, there is not the same sort of identification. In such circumstances the freer the supporting organization to substitute beneficiaries, the weaker will its identification with the beneficiary be. In sum, the beneficiary's power to challenge a decision to substitute does not secure the same linkage as depriving the supporting organization of the power to substitute independently.

Finally, The Trustee argues that the conditions in which it may substitute beneficiaries are the same as those in which the Illinois courts would apply *cy pres*, and that it is merely good draftsmanship to enable The Fund to avoid the expense and delay of application to the courts. Congress, of course, may have meant to make some previously "good draftsmanship" obsolete, since it clearly intended to curb the excesses of a generation of well drafted foundations. Moreover, Congress was not averse to subjecting those foundations to expense.

■ Even if The Trustee's power to substitute is no greater than the court's *cy pres*

power, it makes a difference who has the power. The Trustee indicates that language essentially identical to that in the Designation is approved by Bogert, *Trusts and Trustees* (2nd Ed.), and included in the governing instruments of the San Francisco Foundation and the Cleveland Foundation. These, however, are Community Trusts. A power appropriately exercised by such publicly supported organizations may reasonably be subject to strict control in an organization less responsive to the public. That is what the Tax Reform Act intended.

A Community Trust is in fact required to have the power to modify any restriction or condition on the distribution of funds for any specified charitable purposes or to specified organizations, if it finds that the restriction or condition has become "unnecessary, incapable of fulfillment, or inconsistent with the charitable needs of the community served." Treas.Reg. § 1.170A–9(e)(11)(v). The language is essentially the same as that in the Designation. But the power which enables a Community Trust to be responsive to the needs of its public constituency is neither necessary nor appropriate to the Community Trust's private donors. An organization other than a public charity or community trust which possesses such power is therefore defined as a private foundation, and subject to regulation and control.

■ We note finally that under Illinois law the trustee of a trust is expressly empowered to amend the terms of the governing instrument to avoid private foundation status under Section 509(a)(3).[11] The Trus-

---

10. The Regulations speak of an "identity of interests." *See* footnote 7, above.

11. By an act entitled "An Act to conform certain charitable trusts to the requirements of the Federal Tax Reform Act of 1969," effective June 8, 1971, Ill.Rev.Stat. Ch. 148 § 51, Illinois law provides that:

The trustee of a trust, whenever created, which is, or is treated as, a private foundation . . . as defined in Section 509 . . . of the Internal Revenue Code of 1954 . . . may amend the terms of the governing instrument to the extent necessary to bring the trust into conformity with the requirements for:

(c) exclusion of the trust from private foundation status under Section 509(a)(3) thereof, and for this latter purpose may release any power contained in the governing instrument, may reduce or limit the charitable organizations or classes of charitable organizations in whose favor a power to select may be exercised and may appoint new or additional trustees.

If the trust is for the benefit of one or more named charitable organizations, the trustee shall first obtain the consent of those organizations before making any amendment under subparagraph (c). . . .

The Fund may thus still escape private foundation status by securing the consent of the

tee indicated at oral argument that it had been aware of this option, but rejected it in the belief that the flexibility granted The Fund by the Designation was necessary and desirable. The Trustee is thus in the awkward position of finding in the Designation a particularly desirable degree of flexibility while arguing that the Designation gives him no special discretion. The Trustee can't have it both ways. The flexibility The Trustee desires secures for The Fund a degree of independence which is inconsistent with supporting organization status.

.     .     .     .     .

For the foregoing reasons, the judgment of the Tax Court that The Fund is a private foundation, and not a supporting organization, is affirmed.

named beneficiaries, amending the Designation in an appropriate fashion, and commencing a 60 month termination period. Internal Revenue Code, § 507(b)(1)(B) and Treas.Reg. § 1.507–2(d)(2). It may also obtain an advance ruling that it will thereby cease to be a private foundation. Treas.Reg. § 1.507–2(e).