T.C. Memo. 2002-293


UNITED STATES TAX COURT



LAPHAM FOUNDATION, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent



Docket No. 3881-01X.           Filed November 27, 2002.


    P is a nonprofit corporation described in sec.
501(c)(3), I.R.C., and exempt from taxation under sec.
501(a), I.R.C.  P's articles of incorporation, as filed
in conjunction with its application for exempt status,
provide that it is to operate exclusively for the
benefit of the American Endowment Foundation, a
publicly supported charitable organization.  The
Commissioner determined that P was a private foundation
and not a supporting organization as defined in section
509(a)(3), I.R.C.

    Held:  P is to be classified as a private
foundation on account of failure to satisfy the
integral part test of sec. 1.509(a)-4(i)(3), Income Tax
Regs.

Nancy Ortmeyer Kuhn, for petitioner.

Helen F. Rogers, for respondent.

MEMORANDUM OPINION

NIMS, <u>Judge</u>:  The Lapham Foundation, Inc. (petitioner), is an organization described in section 501(c)(3) and exempt from taxation under section 501(a).  Respondent determined that petitioner is a private foundation as defined in section 509(a), and petitioner brought this action, pursuant to section 7428, for a declaratory judgment that it is a supporting organization within the meaning of section 509(a)(3) and therefore not a private foundation.  The case was submitted on the basis of the pleadings and the facts recited in the administrative record, the latter of which are assumed to be true for purposes of this opinion.  See Rules 122(a), 217.  The principal office of petitioner at the time of filing the petition herein was located in Northville, Michigan.

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

### The Laphams and Estate Storage

Charles P. Lapham was born on September 22, 1933, and Maxine V. Lapham was born on October 14, 1934 (hereinafter individually Mr. Lapham and Mrs. Lapham and collectively the Laphams).  By 1991, the Laphams were involved in an enterprise known as Estate Storage, Inc., a Michigan corporation.  At that time, Estate

Storage was owned 50 percent by the Laphams[1] and 50 percent by an unrelated shareholder.  During 1991, the Laphams lent $806,000 to Estate Storage.  Monthly payments of principal and interest at the rate of 10 percent were made until 1993, at which time the balance was renegotiated with interest at 8 percent.

In 1994, the Laphams purchased the interest of the unrelated shareholder and lent an additional $1 million to Estate Storage. This loan was consolidated with the earlier obligation, and monthly payments of principal and interest at 8 percent continued until the balance was again renegotiated on December 30, 1998. Following such renegotiation, the obligation was memorialized in a promissory note in the face amount of $1,554,244.  The maker of the note was Estate Storage, and the Laphams were the named payees.  The note bore interest at the rate of 7.75 percent per annum, payable in quarterly interest-only installments of $30,113.48.  The principal was due in full no later than December 30, 2013, and the note could be prepaid without penalty at the option of Estate Storage.  The instrument was executed by Mr. Lapham in his capacity as president of Estate Storage.  Estate Storage holds a second-to-die life insurance policy sufficient in

---

[1] The record in this case indicates that, at least as of late 1999, the Laphams' interests in Estate Storage were in fact held through their respective revocable living trusts.  For convenience, we adopt the convention, employed with some frequency throughout the administrative record, of simply referring to the Laphams in their individual capacities.

amount to satisfy the obligation under the note in the event of the untimely deaths of both Mr. and Mrs. Lapham.

The American Endowment Foundation

The American Endowment Foundation (AEF) is a nonprofit corporation organized under the laws of the State of Ohio. AEF has been recognized by the IRS as an organization described in section 501(c)(3) and as a publicly supported entity as defined in section 509(a)(1). The Amended Articles of Incorporation of AEF provide generally that the corporation "is organized and shall be operated as a community foundation." The document further specifies:

> The Corporation shall be operated exclusively for public charitable and educational uses and purposes, as will, in the absolute and uncontrolled discretion of the Board of Trustees, most effectively assist and benefit the community consisting of the inhabitants of the United States of America, including within such purposes:
>
> 1. Investigating, engaging, conducting, supporting, promoting and extending financial aid through grants, gifts, contributions or other assistance to qualified charitable organizations or for public charitable or educational purposes;
>
> 2. Accepting or receiving, absolutely or in trust, from any individuals, firms, associations, corporations, trusts, foundations, or any government or governmental subdivision, unit or agency, gifts, legacies, bequests, devises, remainders, funds and property of any kind, tangible or intangible, real or personal;
>
> 3. Holding, managing, selling, investing, reinvesting the property so acquired by the Corporation and the income thereon and using, applying, contributing and disbursing the

principal and the income thereof solely for the
public charitable and educational purposes of the
Corporation; * * *

AEF operates a donor-advised fund program under which donors
are able to make recommendations regarding the charitable use or
beneficiary of their contributions.  Such suggestions are
generally, but not necessarily, followed, as the organization is
not bound by any donor's advice.  The ultimate decision with
respect to the timing, manner, or recipient of any distribution
lies with AEF.

During 1998, total contributions in the amount of $7,350,000
were received by AEF.  The organization's income was $650,000.

The Lapham Foundation

Petitioner finds its genesis in the Laphams' intent to
return to their community of Northville, Michigan, a portion of
what they had received over the years as long-time residents and
community leaders.  Petitioner was incorporated by Mr. Lapham as
a nonprofit corporation under the laws of the State of Michigan
on December 29, 1998.  The articles of incorporation filed with
the State at that time provide:

The purpose of the Corporation is to operate
exclusively for the benefit of THE AMERICAN ENDOWMENT
FOUNDATION, a publicly supported organization, as
described in Internal Revenue Code Section 509(a)(1) or
(2), or, in the event THE AMERICAN ENDOWMENT FOUNDATION
loses its tax exempt status, substantially abandons
operations, or dissolves, for the benefit of additional
publicly supported organizations of the same class, by

receiving and administering funds for the benefit of THE
AMERICAN ENDOWMENT FOUNDATION or other publicly-supported
[sic] organizations of the same class.

The articles also named the Laphams as petitioner's initial
officers and set forth the following with respect to the board of
directors:

> (a) The affairs and business of the Corporation
> shall be conducted by a Board of Directors consisting
> of three or more persons.  The members of the Board
> shall be elected annually by the existing directors.
> Provided, however, members of the Board who are
> disqualified persons as defined in Section 4946(a) of
> the Internal Revenue Code shall not comprise a majority
> on the Board.  Provided further, however, that
> foundation managers and publicly supported
> organizations are not disqualified persons for purposes
> of this requirement.

> (b) The first Board of Directors shall be:

> > CHARLES P. LAPHAM
> > MAXINE V. LAPHAM
> > DARCY CONNOLLY
> > GEORGIANA CHASE[2]
> > JOHN A. GALLINA

> (c) In the event of a vacancy on the Board of
> Directors by reason of death, resignation or removal,
> the replacement directors(s) will be elected in
> accordance with the by-laws.  CHARLES P. LAPHAM and
> MAXINE V. LAPHAM shall each be a director of the
> Corporation for the full term of his or her natural
> life, or until his or her resignation, in accordance
> with the by-laws.

On December 31, 1998, the Laphams contributed to petitioner

the above-described promissory note with face amount of

---

[2] The first name of Ms. Chase is variously spelled in the
parties' filings as both Georgiana and Georgianna, with the
latter seeming predominant in the administrative record (and
generally used herein).

$1,554,244.00.  Simultaneously with the foregoing contribution, petitioner and the Laphams entered into a charitable gift annuity agreement whereby petitioner agreed to pay the Laphams an annual annuity of $116,568.32 over the joint lives of the donors, payable in quarterly installments of $29,142.08.  The obligation is unsecured.

The Administrative Process

In a Form 1023, Application for Recognition of Exemption, received by the Internal Revenue Service (IRS) in July of 1999, petitioner sought recognition as a section 501(c)(3) tax-exempt organization and as a section 509(a)(3) supporting organization. Therein petitioner indicated that it would "support THE AMERICAN ENDOWMENT FOUNDATION * * * and other qualified charitable organizations by receiving and administering funds for the benefit of THE AMERICAN ENDOWMENT FOUNDATION."  Petitioner further explained that it would be "operated in connection with" AEF and would "receive[] donations which would otherwise be the subject of fundraising activities conducted by the supported organization."

The Form 1023 described petitioner's sources of financial support as "Donations from the Lapham family and its friends, including individuals and businesses" and "Interest on investments".  The statement of revenue and expenses included with the application reflected gifts, grants, and contributions

of $1,554,244 in 1998 and anticipated gifts, grants, and contributions of $5,000 per year for 1999 and 2000. The statement further projected for both 1999 and 2000 gross investment income of $120,454 and an annuity obligation of $116,568. The resultant excess of revenue over expenses for 1999 and 2000 was therefore a projected $8,886 ($3,886 + $5,000), respectively. The $1,554,244 note receivable was shown on the attached balance sheet as petitioner's sole asset.

During the administrative process, petitioner also represented that: (1) Petitioner would receive outright testamentary gifts of approximately $693,000 at the death of the Laphams through beneficiary designations of retirement assets; (2) petitioner would be the beneficiary of a charitable lead trust under the revocable living trusts of the Laphams which, based upon certain assumptions, would distribute $355,834 annually to petitioner for a period of 17 years from the Laphams' deaths; and (3) the Laphams had pledged an additional $207,733 to petitioner contingent on approval under section 501(c)(3) and 509(a)(3).

As regards petitioner's support of AEF, the Form 1023 reflected that petitioner intended to pay at least 85 percent of its income to the organization and anticipated a contribution annually of approximately $7,600. Later, in correspondence exchanged during administrative consideration, petitioner stated:

Applicant will specifically provide that the American Endowment Foundation shall receive one-third of the support provided through the donor advised fund to expand its representation in Southeastern Michigan. The remaining two-thirds will support only qualified charities of Northville, Michigan under the independent determination of American Endowment Foundation's board of directors, based upon the non-binding recommendations of the Applicants [sic] advisory committee. * * *

*   *   *   *   *   *   *

The purpose to which the funds are put will represent a projected $5,682 or 39.11% of the American Endowment Foundation's overall expenditures toward supplies, postage, telephone and travel. Furthermore, these funds will represent virtually the entire expenditure by the American Endowment Foundation within the Southeastern Michigan region.

The above suggests that petitioner intended to recommend to AEF that one-third of its contributions to the donor-advised fund be used to support activities in southeastern Michigan and two-thirds be used to support charities in Northville, Michigan. As discussed above, AEF is not bound by such recommendations.

With its Form 1023, petitioner submitted to the IRS a copy of the organization's bylaws. Pertaining to governance of petitioner, the bylaws reiterated that there were to be at least three directors, a majority of which could not consist of disqualified persons under section 4946. The bylaws provided that for purposes of conducting business, a majority of the entire board would constitute a quorum, with a majority vote thereof determining board action. The instrument further

specified that any director, except Mr. and Mrs. Lapham, could be removed with or without cause by a majority vote of the directors then in office.

In addition to the Laphams, the individuals named to petitioner's initial board of directors were John A. Gallina of Northville, Michigan; Georgianna Chase of Northville, Michigan; and Darcy Connolly of Cincinnati, Ohio. None of these three directors had a family relationship with the Laphams, had an employment relationship with the Laphams or any business owned by the Laphams, or received a fee for services provided to the Laphams. Mr. Gallina was appointed to petitioner's board by AEF; petitioner represented that Mr. Gallina also served on the boards of directors of other organizations in southeastern Michigan supporting AEF. Georgianna Chase was an elder of the First Presbyterian Church of Northville, nominated by the congregation and elected by general vote to the church's governing body.

As correspondence passed between the parties during the administrative process, respondent by letter dated April 19, 2000, recognized petitioner as exempt from taxation pursuant to section 501(c)(3) and issued a proposed adverse ruling as to petitioner's private foundation classification. By letter dated July 14, 2000, respondent supplied additional grounds for the proposed adverse ruling. The final submission from petitioner contained in the administrative record is a letter with

attachments dated August 21, 2000.  In this communication,
petitioner proposed to amend its articles to include the First
Presbyterian Church of Northville and the Boy Scouts of America
Detroit Area Council, specifically troops of Northville,
Michigan, as supported organizations, with AEF remaining as the
third supported entity.  Petitioner offered the following
information about its intended support of the church:

> Applicant will provide support to First
> Presbyterian Church of Northville of at least $10,000
> annually.  The contribution will support two specific
> programs of First Presbyterian Church of Northville,
> namely, the Music Endowment Fund and the Land/Real
> Estate Acquisition Fund.  Applicant's contribution of
> $1,000 to the Music Endowment Fund constitutes 40% of
> an approximately $2500 budget for the year 2000.
> Applicant's contribution of $9,000 to the Land/Real
> Estate Acquisition Fund constitutes 80% of an
> approximately $15,000 budget for the year 2000.

No details were given with respect to support of the Boy Scouts.

Petitioner also proposed to amend its bylaws and the Estate
Storage promissory note to address concerns relating to issues of
control.  Enclosed with the letter was a copy of the proposed
amended bylaws reflecting changes which included providing that a
quorum could not consist of a majority of disqualified persons,
that any director could be removed by a majority vote of the
current directors, and that directors were prohibited from
engaging in any excess benefit transactions as defined in section
4958.  Similarly enclosed was a copy of a proposed demand note

for use in lieu of the 15-year term instrument and incorporating reference to mortgage security and protection against other liens.

By letter dated December 18, 2000, respondent issued a final adverse ruling regarding petitioner's status as a private foundation. The letter stated:

> This ruling is made for the following reason(s):
>
> You fail to meet the "attentiveness test" under the integral part test found under section 1.509(a)-4(i)(3)(iii) of the Income Tax Regulations.
>
> You fail to meet the test for control by disqualified persons set forth in section 1.509(a)-4(j)(1) of the Regulations. Your primary asset is a promissory note secured by assets of a corporation controlled by disqualified persons and the income of which is payable by that same corporation. Disqualified persons are in a position to control you by means of the power they exercise, through their corporation, with respect to your primary asset.

### Discussion

## I.  General Rules

Section 509(a) defines a private foundation as any organization described in section 501(c)(3) except those excluded under section 509(a)(1) through (4).  Paragraphs (1) and (2) of section 509(a) detail what are referred to as publicly supported entities, sec. 1.509(a)-4(a)(5), Income Tax Regs., and encompass religious, educational, medical, and governmental entities and institutions which receive substantial public support.  Paragraph

(3) of section 509(a) describes what are termed supporting organizations, sec. 1.509(a)-4(a)(5), Income Tax Regs., as follows:

an organization which--

(A) is organized, and at all times thereafter is operated, exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more specified organizations described in paragraph (1) or (2),

(B) is operated, supervised, or controlled by or in connection with one or more organizations, described in paragraph (1) or (2), and

(C) is not controlled directly or indirectly by one or more disqualified persons (as defined in section 4946) other than foundation managers and other than one or more organizations described in paragraph (1) or (2); * * *

Paragraph (4) excepts entities involved exclusively in testing for public safety.

As a practical matter, organizations classified as private foundations are subject to an excise tax regime and to deductibility limits on contributions not applicable to publicly supported charities and other excepted entities. Secs. 170, 4940-4948. The rationale underlying this distinction, and its relationship to supporting organizations in particular, has been encapsulated by the Court of Appeals for the Seventh Circuit:

Public charities were excepted from private foundation status on the theory that their exposure to public scrutiny and their dependence on public support would keep them from the abuses to which private foundations were subject. Supporting organizations are similarly excepted in so far as they are subject to the

scrutiny of a public charity.  The Treasury Regulations therefore provide that the supporting organization must be responsive to the needs of the public charity and intimately involved in its operations.  [Quarrie Charitable Fund v. Commissioner, 603 F.2d 1274, 1277-1278 (7th Cir. 1979), affg. 70 T.C. 182 (1978); fn. refs. omitted.]

A.  Section 509(a)(3)(A)

Regulations promulgated under section 509(a)(3) set forth tests expounding on the requirements recited in subparagraphs (A) through (C) above.  Section 1.509(a)-4(b) through (e), Income Tax Regs., specifies organizational and operational tests that relate to the criteria of section 509(a)(3)(A).  The organizational test is not at issue in this proceeding, and because respondent raises no arguments under the operational test distinct from those addressed more fully by respondent in connection with subparagraphs (B) and (C), we do not separately discuss the elements and tests of section 509(a)(3)(A).

B.  Section 509(a)(3)(B)

Section 509(a)(3)(B) prescribes the nature of the relationship that must exist between the supporting organization and the publicly supported organization.  Regulations elaborate that the statute requires one of the following three relationships to be present:  (1) The supporting organization may be operated, supervised, or controlled by one or more publicly supported organizations (comparable to a parent-subsidiary relationship where the supporting organization is under the

direction of the supported organization); (2) the supporting organization may be supervised or controlled in connection with one or more publicly supported organizations (comparable to a brother-sister relationship where the entities are under common control); and (3) the supporting organization may be operated in connection with one or more publicly supported organizations (where the supporting organization is otherwise responsive to, and significantly involved in the operations of, the publicly supported organization). Sec. 1.509(a)-4(f) to (i), Income Tax Regs. Petitioner here contends that it falls within the third of the alternatives just described.

The regulations further impose two specific tests that must be satisfied in order for an organization to qualify as operated in connection with a publicly supported entity; namely, the responsiveness test and the integral part test. Sec. 1.509(a)-4(i), Income Tax Regs. The responsiveness test is designed to ensure that the supporting organization is responsive to the needs of the publicly supported organization by requiring that the supported organization have the ability to influence the activities of the supporting organization. Sec. 1.509(a)-4(i)(2), Income Tax Regs. As relevant herein, the test mandates that:

> (a) One or more officers, directors, or trustees of the supporting organization are elected or appointed by the officers, directors, trustees, or membership of the publicly supported organizations;

(b) One or more members of the governing bodies of the publicly supported organizations are also officers, directors or trustees of, or hold other important offices in, the supporting organizations; or

(c) The officers, directors or trustees of the supporting organization maintain a close and continuous working relationship with the officers, directors or trustees of the publicly supported organizations; and

(d) By reason of (a), (b), or (c) of this subdivision, the officers, directors or trustees of the publicly supported organizations have a significant voice in the investment policies of the supporting organization, the timing of grants, the manner of making them, and the selection of recipients of such supporting organization, and in otherwise directing the use of the income or assets of such supporting organization. [Sec. 1.509(a)-4(i)(2)(ii), Income Tax Regs.]

The integral part test seeks to ensure that the supporting organization "maintains a significant involvement in the operations of one or more publicly supported organizations and such publicly supported organizations are in turn dependent upon the supporting organization for the type of support which it provides." Sec. 1.509(a)-4(i)(3)(i), Income Tax Regs. Two alternative sets of criteria exist under the regulations for satisfying this test. Id. The first alternative (sometimes referred to for convenience by the parties (with different punctuation) and herein as the "but-for subtest") is set forth in section 1.509(a)-4(i)(3)(ii), Income Tax Regs.:

The activities engaged in for or on behalf of the publicly supported organizations are activities to perform the functions of, or to carry out the purposes of, such organizations, and, but for the involvement of

the supporting organization, would normally be engaged in by the publicly supported organizations themselves.

The second alternative (referred to as the "attentiveness subtest") is laid out in section 1.509(a)-4(i)(3)(iii), Income Tax Regs.:

(a) The supporting organization makes payments of substantially all of its income to or for the use of one or more publicly supported organizations, and the amount of support received by one or more of such publicly supported organizations is sufficient to insure the attentiveness of such organizations to the operations of the supporting organization.  In addition, a substantial amount of the total support of the supporting organization must go to those publicly supported organizations which meet the attentiveness requirement of this subdivision with respect to such supporting organization.  Except as provided in (b) of this subdivision, the amount of support received by a publicly supported organization must represent a sufficient part of the organization's total support so as to insure such attentiveness.  In applying the preceding sentence, if such supporting organization makes payments to, or for the use of, a particular department or school of a university, hospital or church, the total support of the department or school shall be substituted for the total support of the beneficiary organization.

(b) Even where the amount of support received by a publicly supported beneficiary organization does not represent a sufficient part of the beneficiary organization's total support, the amount of support received from a supporting organization may be sufficient to meet the requirements of this subdivision if it can be demonstrated that in order to avoid the interruption of the carrying on of a particular function or activity, the beneficiary organization will be sufficiently attentive to the operations of the supporting organization.  This may be the case where either the supporting organization or the beneficiary organization earmarks the support received from the supporting organization for a particular program or activity, even if such program or activity is not the

beneficiary organization's primary program or activity so long as such program or activity is a substantial one.

All pertinent factors are to be considered under the foregoing subtest in order to determine whether the amount of support received by the beneficiary organization is sufficient to ensure attentiveness. Sec. 1.509(a)-4(i)(3)(iii)(d), Income Tax Regs. Factors highlighted by the regulations include the number of beneficiaries, the length and nature of the relationship between the organizations, the purpose to which the funds are put, and the imposition of a requirement that the supporting organization furnish reports to the supported organization. Id. As a general premise, the regulations provide that the greater the amount involved as a percentage of the beneficiary organization's total support, the greater the likelihood that the required degree of attentiveness will be present. Id. There is, however, the caveat that "evidence of actual attentiveness by the beneficiary organization is of almost equal importance." Id.

C. Section 509(a)(3)(C)

Section 509(a)(3)(C) specifies the third basic requirement for all charitable entities wishing to be classified as supporting organizations. A supporting organization may not be controlled directly or indirectly by disqualified persons, including substantial contributors; their family members; and corporations, partnerships, or trusts in which interests of more

than 35 percent are owned by disqualified persons.  Secs. 509(a)(3)(C), 4946(a); sec. 1.509(a)-4(j)(1), Income Tax Regs. Regulations offer the following guidance with respect to this control test:

> An organization will be considered "controlled", for purposes of section 509(a)(3)(C), if the disqualified persons, by aggregating their votes or positions or authority, may require such organization to perform any act which significantly affects its operations or may prevent such organization from performing such act. This includes, but is not limited to, the right of any substantial contributor or his spouse to designate annually the recipients, from among the publicly supported organizations of the income attributable to his contribution to the supporting organization. * * * [Generally] a supporting organization will be considered to be controlled directly or indirectly by one or more disqualified persons if the voting power of such persons is 50 percent or more of the total voting power of the organization's governing body or if one or more of such persons have the right to exercise veto power over the actions of the organization.  Thus, if the governing body of a foundation is composed of five trustees, none of whom has a veto power over the actions of the foundation, and no more than two trustees are at any time disqualified persons, such foundation will not be considered to be controlled directly or indirectly by one or more disqualified persons by reason of this fact alone.  However, all pertinent facts and circumstances including the nature, diversity, and income yield of an organization's holdings, the length of time particular stocks, securities, or other assets are retained, and its manner of exercising its voting right with respect to stocks in which members of its governing body also have some interest, will be taken into consideration in determining whether a disqualified person does in fact indirectly control an organization. [Sec. 1.509(a)-4(j)(1), Income Tax Regs.]

II. Preliminary Considerations

As a threshold matter, we first address a dispute between the parties regarding whether the tests set out above are to be applied with or without taking into consideration certain alleged changes to petitioner's intended operations and governing documents. Petitioner, as previously discussed, proposed in a letter dated August 21, 2000, to amend its articles of incorporation to include the First Presbyterian Church of Northville and the Boy Scouts as additional supported organizations, to amend its bylaws to impose greater restrictions on the authority of disqualified persons, and to restructure the Estate Storage note as a demand instrument. No further materials are contained in the administrative record to indicate whether the proposed changes were in fact implemented.

On brief, however, petitioner claims to be operated pursuant to "Amended and Restated By-Laws" and requests findings of fact consistent with the proposed changes to board procedures and the addition of the First Presbyterian Church of Northville as a supported organization. For example, petitioner suggests the following be found as fact:

> Petitioner is to be operated as a supporting organization to the American Endowment Foundation. As part of the administrative process with Respondent, Petitioner established a supporting relationship with the First Presbyterian Church of Northville. Additionally, Petitioner proposed establishing a supporting relationship with the Boy Scouts of America

Detroit Area Council, specifically the troops in Northville, Michigan. [Exhibit references omitted.]

Petitioner also alleges to have provided $10,000 to the First Presbyterian Church of Northville in 2000. Petitioner elsewhere states that neither the proposal concerning the Boy Scouts nor the offer to convert the promissory note to demand note was acted upon.

Respondent objects to factual assertions purportedly derived from the amended articles and bylaws. In this connection, respondent emphasizes that the record does not establish that the proposed changes were formally implemented, nor does it show the financial wherewithal of petitioner to support additional beneficiaries at the level alleged.

Rule 217 governs procedural matters relevant to disposition of actions for declaratory judgment. Paragraph (a) of Rule 217 provides:

> Disposition of an action for declaratory judgment, which does not involve either a revocation or the status of a governmental obligation, will ordinarily be made on the basis of the administrative record, as defined in Rule 210(b)(10). Only with the permission of the Court, upon good cause shown, will any party be permitted to introduce before the Court any evidence other than that presented before the Internal Revenue Service and contained in the administrative record as so defined. * * *

The referenced Rule 210(b)(10), as germane herein, defines the administrative record to include the request for determination; all documents, protests, and related papers submitted to the IRS;

all written correspondence between the IRS and the applicant; all pertinent returns filed with the IRS; the articles of incorporation of the organization and any similar or related documents and any modifications thereof; and the notice of determination by the Commissioner.

Here the parties jointly filed the administrative record now before us with a stipulation "that the exhibits attached constitute the entire administrative record" and "that said exhibits are genuine". Neither party has requested leave to supplement the administrative record with further evidence or offered any additional documentary materials. The administrative record closes with petitioner's having proposed several changes to its operations and governing instruments. On brief, petitioner represents that certain changes were made but repudiates other changes with the result that the Court is uncertain exactly what petitioner is asking us to take into account. Moreover, petitioner's statements on brief regarding which changes were effectuated fall outside the parameters of Rule 217 and are hardly a substitute for proof of formal amendment and the actual resultant contents of governing documents. In these circumstances, we are constrained to reach our disposition on the basis of the administrative record as constituted without taking any such changes into account.

Accordingly, we base our ruling herein solely on the materials exchanged by the parties during the administrative process. Since those materials do not establish implementation of proposed changes, our conclusions as to petitioner's status will turn on application of the tests under section 509(a)(3) to petitioner's original articles of incorporation and bylaws.

As a second preliminary matter, we make several observations regarding burden of proof. Pursuant to Rule 217(c), the burden of proof rests upon petitioner as to grounds set forth in the notice of determination and upon respondent as to any ground not stated in the notice. Respondent raised the responsiveness test as a new issue by means of an affirmative pleading in the answer. The parties here agree that respondent bears the burden as to the responsiveness test and that petitioner bears the burden as to the attentiveness subtest and the control test. They disagree as to who bears the burden with respect to the but-for subtest. However, because our disposition on this point does not depend on application of the burden of proof, we need not further address the dispute.

III. Responsiveness Test

As previously mentioned, petitioner claims to be an organization "operated in connection with" a supported organization, AEF, for purposes of the relationship requirement prescribed in section 509(a)(3)(B). See sec. 1.509(a)-4(f)(2),

Income Tax Regs. To qualify as such, petitioner must satisfy both the responsiveness test of section 1.509(a)-4(i)(2), Income Tax Regs., and the integral part test of section 1.509(a)-4(i)(3), Income Tax Regs. We consider each of these tests seriatim.

The responsiveness test is structured to ensure that the supported organization will have the ability to influence the supporting organization, thereby ensuring that the supporting organization will be responsive to the needs of the supported organization. Cockerline Meml. Fund v. Commissioner, 86 T.C. 53, 59 (1986); Nellie Callahan Scholarship Fund v. Commissioner, 73 T.C. 626, 633 (1980); Roe Found. Charitable Trust v. Commissioner, T.C. Memo. 1989-566; sec. 1.509(a)-4(i)(2), Income Tax Regs.

Under the circumstances of this case, the pertinent requirements are found in subdivisions (a) and (d) of section 1.509(a)-4(i)(2)(ii), Income Tax Regs. Subdivision (a) specifies that at least one officer, director, or trustee of the supporting organization must be appointed or elected by the supported organization. Here the administrative correspondence indicates that Mr. Gallina was appointed to petitioner's board of directors by AEF. Petitioner also offers a proposed finding of fact to that effect, to which respondent has "No objection." In addition, petitioner's bylaws mandate that "one or more members

of the Board of Directors shall be appointed by the Board of Directors of the publicly supported organization(s) for whose benefit the Corporation exists." We are satisfied that petitioner is in conformity with section 1.509(a)-4(i)(2)(ii)(a), Income Tax Regs.

Subdivision (d) of 1.509(a)-4(i)(2)(ii), Income Tax Regs., then requires that, by reason of the above relationship, the supported organization have a "significant voice" in the investment policies of the supporting organization; in the timing, manner, and recipients of grants made by the supporting organization; and in otherwise directing the use of the income or assets of the supporting organization. The term "significant" in this context has been interpreted to mean "'likely to have influence,' not control." Cockerline Meml. Fund v. Commissioner, supra at 60 (quoting Webster's Third New International Dictionary 2116 (1981)); see also Roe Found. Charitable Trust v. Commissioner, supra.

Respondent by answer raised the issue of failure to satisfy the responsiveness test, alleging therein that the director appointed by AEF lacked a significant voice in the activities specified in section 1.509(a)-4(i)(2)(ii)(d), Income Tax Regs. On brief respondent argues that no facts have been given to show Mr. Gallina will have a significant voice in determining petitioner's investment policies or when and where petitioner's

funds will be paid.  Respondent similarly states that there is no evidence that nondisqualified directors will have any control over the income or assets of petitioner.  In particular, respondent focuses on the fact that the only asset held by petitioner is the Estate Storage note and observes that the charitable gift annuity obligation will require payments equal to the majority of the note's annual income.  Hence, it is respondent's view that there are, as a practical matter, no meaningful assets or investments for the board to manage.

At the outset, we reiterate that respondent bears the burden of proof on this issue, which creates a situation quite different from that in <u>Roe Found. Charitable Trust v. Commissioner</u>, <u>supra</u>, cited favorably by respondent.  In <u>Roe Found. Charitable Trust v. Commissioner</u>, <u>supra</u>, we relied in significant part on the taxpayer's failure to indicate how the relevant trustee would have a significant voice.  Here respondent must demonstrate that AEF will not have the requisite significant voice, and we conclude respondent has not done so.

Mr. Gallina is one of five directors, and petitioner has represented that the AEF director will have a voice equal to any of the remaining four.  Respondent has not established otherwise. Petitioner's articles of incorporation empower the corporation through its board of directors to carry out the purposes of the entity by, among other things, owning, acquiring, transferring,

and disposing of property; receiving and administering property by gift, devise, or bequest; and entering into contracts. Furthermore, although petitioner currently has few assets requiring active management, respondent has not shown that principal payments on the note or additional annual contributions, etc., estimated by petitioner will not occur to render the management role increasingly material. Certain of respondent's statements also seem to conflate influence with control to a degree unsupported by the regulations and caselaw.

Moreover, as pertains to the timing, manner, and recipients of grants, petitioner indicated during the administrative process that the AEF director would serve on the advisory committee of the donor-advised fund and would thereby have a significant voice in recommending grants. Again, respondent has introduced nothing proving to the contrary. We further are mindful that AEF exercises final authority over distributions from the donor-advised fund. Hence, we cannot find that AEF lacks the necessary ability to influence petitioner's activities in these matters. Accordingly, we conclude that petitioner's governance and affairs are structured to satisfy the responsiveness test of section 1.509(a)-4(i)(2)(ii), Income Tax Regs.

IV.  Integral Part Test

The complementary and interrelated roles of the responsiveness and integral part tests have been expressed by this Court as follows:

> While the responsiveness test guarantees that the supported organization will have the ability to influence the supporting organization's activities, the integral part test insures that the supported organization will have the motivation to do so.  The general thrust of this regulation is that the supporting organization must maintain a significant involvement in the operations of the supported organization so that the latter will be attentive to the supporting organization's operations.  [Nellie Callahan Scholarship Fund v. Commissioner, 73 T.C. at 637-638.]

As previously discussed, the regulations in section 1.509(a)-4(i)(3), Income Tax Regs., offer two alternative sets of criteria for satisfying the integral part test, which we for convenience refer to as the "but-for subtest" of subdivision (ii) and the "attentiveness subtest" of subdivision (iii).

A.  But-For Subtest

The but-for subtest will be met where:  (1) The activities engaged in for or on behalf of the supported organization are activities to perform the functions of or to carry out the purposes of the supported organization, and (2) but for the involvement of the supporting entity, such activities would normally be engaged in by the supported organization itself. Sec. 1.509(a)-4(i)(3)(ii), Income Tax Regs.

With respect to the first prong set forth above, we have stated that "This rule generally applies only to situations where the supporting organization <u>actually</u> engages in activities that benefit the supported organization, such as performing a specific function for one or more publicly supported organizations."  <u>Roe Found. Charitable Trust v. Commissioner</u>, T.C. Memo. 1989-566.  In a similar vein, respondent maintains that the but-for subtest applies only in cases where the involvement of the supporting organization extends beyond merely making grants or monetary donations.  Petitioner, on the other hand, contends that "activities" in section 1.509(a)-4(i)(3)(ii), Income Tax Regs., should be construed in a manner consistent to its use elsewhere in the regulations under section 509(a), with the result that the term should encompass grant making.  Petitioner cites section 1.509(a)-4(e)(1), Income Tax Regs., which uses the word and then explains:  "Such activities may include making payments to or for the use of, or providing services or facilities for, individual members of the charitable class benefited by the specified publicly supported organization."

We, however, need not resolve this dispute.  Even if we were to assume arguendo that grant making is properly characterized as an activity for purposes of section 1.509(a)-4(i)(3)(ii), Income Tax Regs., a matter which is by no means clear, the administrative record establishes that petitioner cannot satisfy

the second prong set out above.[3]  Before setting forth the
reasons for our conclusion, it is necessary to describe
petitioner's argument in more detail.

Petitioner summarizes its position on the but-for subtest as
follows:

> Petitioner is providing the only support the
> American Endowment Foundation receives for the support
> of activities in Northville, Michigan.  "But for"
> Petitioner's support, those activities would not exist,
> and would not be funded unless the American Endowment
> Foundation found funding elsewhere. * * *

Petitioner also states that AEF "is dependent upon Petitioner for
its grants to perform the functions of the public charities in
the Northville, Michigan area."  Thus, petitioner views the
pertinent activities narrowly, i.e., in terms of support of the
Northville, Michigan, region, and not broadly, i.e., in terms of
AEF's mission to assist the community of U.S. inhabitants.

We reject petitioner's argument on the ground that it is
based upon a faulty factual premise; namely, that petitioner's
support to AEF is dedicated to activities in Northville,
Michigan, or southeastern Michigan.  This premise is based upon
the fact that petitioner intends to recommend to AEF that
petitioner's contributions to the donor-advised fund be used to

---

[3] As previously indicated, our conclusions with respect to
the but-for subtest do not turn on who bears the burden of proof.
In contrast to our analysis of the responsiveness test, we here
do not rely on a failure of proof by either party but rather
apply the regulatory standard to the facts as evidenced by the
administrative record.

support charities in Northville, Michigan, or southeastern Michigan. However, as found above, AEF is not bound by such recommendations and can use the support received from petitioner to fund charitable activities anywhere in the United States.

AEF endeavors through its grant making to benefit communities throughout the United States. Yet such grant-making activities cannot properly be characterized as something in which AEF would be engaged but for petitioner's support. Rather, distributing grant moneys is something in which AEF is and will continue to be engaged regardless of support from petitioner. Hence, the record reveals no but-for relationship between petitioner's operations and those of AEF and, accordingly, cannot establish the type of dependency sought by the integral part test.

B.  Attentiveness Subtest

Under the attentiveness subtest, (1) the supporting organization must make payments of substantially all of its income to or for the use of the supported organization, and (2) either (a) the amount of support must be sufficient to ensure the attentiveness of the supported entity or (b) the funds must be earmarked for a substantial program or activity of the supported entity, such that the supported organization will be attentive to avoid interruption thereof. Sec. 1.509(a)-4(i)(3)(iii)(a) and (b), Income Tax Regs.

In addition, a substantial amount of the total support of the supporting organization must go to those publicly supported organizations which meet the attentiveness requirement. Sec. 1.509(a)-4(i)(3)(iii)(a), Income Tax Regs.

The phrase "substantially all of its income", as used in the integral part test, has been interpreted to mean 85 percent or more of net income. Rev. Rul. 76-208, 1976-1 C.B. 161 (stating that the terminology should be given the same meaning as in sec. 53.4942(b)-1(c), Foundation Excise Tax Regs.). Since petitioner has indicated that it will distribute at least 85 percent of its net annual income, we focus on the further criteria intended to cultivate attentiveness.

With respect to the first method for ensuring attentiveness, support significant in amount relative to the beneficiary's total support is generally the defining characteristic. Sec. 1.509(a)-4(i)(3)(iii)(d), Income Tax Regs. By this standard, we conclude that petitioner's proposed contributions to AEF do not rise to the requisite level. Anticipated annual contributions of approximately $7,600 from petitioner, when measured against the total annual contributions received by AEF of more than $7 million, are not sufficient to guarantee attentiveness.[4]

---

[4] Although it is unclear how petitioner's proposed "pledge" of $207,733 would factor into the support calculation, we are satisfied that its impact would not be material for purposes of our conclusion on this issue.

Additionally, while evidence of actual attentiveness can be equally important, id., the record on this score is less than persuasive. Petitioner has mentioned that it will furnish financial reports to AEF and cites AEF's appointment of a Northville resident to petitioner's board as evidence of actual attentiveness. On these facts, however, we remain unconvinced that the two features highlighted portend the type of ongoing monitoring and attentiveness envisaged in the regulation. Given the vast difference in the size and scope of the two entities' programs, establishing actual attentiveness would require more than pointing to a few administrative formalities.

We now turn to the earmarking facet of the attentiveness subtest, noting that petitioner appears on brief to emphasize this argument over the support-based considerations just addressed, as follows:

> Petitioner's support to the American Endowment Foundation has been earmarked for use in Northville, Michigan. This is the only support that the American Endowment Foundation received to support activities in Northville, Michigan. Without Petitioner's support, the Northville activities will be interrupted. Therefore, even though the percentage of support provided by Petitioner to American Endowment Foundation's overall budget is small, it is 100% of the support that American Endowment Foundation provides to Northville residents. * * *

On the present facts, there exist at least two barriers to petitioner's ability to satisfy the integral part test through the alleged earmarking. The first is the requirement that either

petitioner or AEF earmark the funds for a particular program or activity. Because the contributions are made to a donor-advised fund, petitioner cannot definitively earmark the moneys for any specific project. Rather, petitioner is limited to making recommendations which AEF is not bound to, and will not necessarily, implement. Moreover, petitioner has not established that AEF has in fact earmarked petitioner's contributions for a particular venture.

Second, the regulations mandate that the payments be earmarked for a <u>substantial</u> program or activity of the supported organization. Again, the administrative record belies that supporting Northville, Michigan, is a substantial activity of AEF. Even benefiting Michigan as a whole has not been shown to be a substantial focus of AEF, and there is no evidence that the rather minimal expenditures made in that State by AEF ($5,500 in 1998) would be interrupted absent petitioner's support. Petitioner therefore has failed to prove that its operations will ensure AEF's attentiveness.

V. <u>Control Test</u>

In view of our holding above that the integral part test is not met on the record presented, we need not reach the control test. Petitioner's failure to satisfy section 509(a)(3)(B) obviates any need to consider section 509(a)(3)(C) or to give further attention to section 509(a)(3)(A). Even if petitioner

were to satisfy the tests of the latter two provisions, as to which we express no opinion, its failure to meet the requirements of section 509(a)(3)(B) is fatal to its position that it is a supporting organization and not a private foundation as defined in section 509.  In summary then, we hold that petitioner is to be classified as a private foundation on account of failure to satisfy the integral part test of section 1.509(a)-4(i)(3), Income Tax Regs., as delineated above.

　　　To reflect the foregoing,

　　　　　　　　　　　　　　　Decision will be entered

　　　　　　　　　　　for respondent.