T.C. Memo. 2002-300

UNITED STATES TAX COURT

CHRISTIE E. CUDDEBACK AND LUCILLE M.
CUDDEBACK MEMORIAL FUND, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5453-01X.     Filed December 6, 2002.

<u>David K. Hayes</u>, for petitioner.

<u>Robin W. Denick</u>, for respondent.

MEMORANDUM OPINION

WHALEN, <u>Judge</u>:  This is an action for declaratory
judgment, pursuant to section 7428(a)(1)(B), involving
respondent's determination with respect to the initial
classification of petitioner as a private foundation, as
defined by section 509(a).  Unless stated otherwise, all
section references are to the Internal Revenue Code as in

effect at the time of respondent's determination. The issue for decision is whether respondent correctly determined that petitioner is a private foundation as defined by section 509(a), rather than a supporting organization within the meaning of section 509(a)(3). The narrow issue presented by this case is whether respondent correctly determined that petitioner does not meet the "integral part test" prescribed by section 1.509(a)-4(i)(3), Income Tax Regs.

The parties submitted this case for decision without trial in accordance with Rule 122. See Rule 217(b)(2). In this opinion, all Rule references are to the Tax Court Rules of Practice and Procedure. The stipulation of facts and the accompanying exhibits filed by the parties are hereby incorporated in this opinion.

On the basis of the record, we find that petitioner exhausted the administrative remedies available to it within the Internal Revenue Service and that the jurisdictional requirements to maintain this action, enumerated by Rule 210(c), are satisfied. At the time the petition was filed on its behalf, petitioner's address was in Baltimore, Maryland.

## Background

Petitioner is a testamentary trust which was created under the last will and testament of Lucille M. Cuddeback (referred to herein as the will), as amended by the second codicil to last will and testament of Lucille M. Cuddeback, executed on February 28, 1991 (referred to herein as the second codicil). In this opinion, we sometimes refer to Ms. Cuddeback as the testator.

Item Two G.2 of the testator's will, as amended by the second codicil, directs that one-half of the residue of the testator's estate is to be transferred in trust with the intention that the trust qualify as a charitable remainder unitrust under section 664. As amended by the second codicil, the will directs that 5 percent of the net fair market value of the principal of the trust is to be paid in monthly installments to Ms. Cuddeback's niece, Ms. Vivian B. Nelson, during her life. Thereafter, the trust's net income is to be paid to three charities, and the trust is to be known as the Christie E. Cuddeback and Lucille M. Cuddeback Memorial Fund (referred to either as petitioner or the Cuddeback Fund).

The three recipients of the net income of the trust following Ms. Nelson's death are Bedford Presbyterian Church, New York, New York (Bedford), Parklane Baptist

Church, Baltimore, Maryland (Parklane), and Keswick Multi-Care Center, formerly known as the Keswick Home for the Incurables of Baltimore City, Baltimore, Maryland, (Keswick). Each of these recipients is a charitable organization described in section 501(c)(3) and is classified as other than a private foundation under sections 509(a)(1) and 170(b)(1)(A)(i) or (iii). Such organizations are sometimes referred to as "publicly supported [organizations]". See sec. 1.509(a)-4(a)(5), Income Tax Regs. Under the terms of the second codicil, Bedford and Parklane are each to receive 10 percent of the Cuddeback Fund's net income, and Keswick is to receive 80 percent of petitioner's net income at annual or more frequent intervals.

Keswick's primary program or activity is providing in-house, full-time nursing home care (domiciliary care). Keswick also provides daycare to individuals through its adult day services center or program. In conjunction with this daycare program, Keswick offers "grants" to some participants who could not otherwise afford to pay the full amount that Keswick charges for its services.

With respect to Keswick, the second codicil provides in pertinent part as follows:

The remaining net income shall be paid in annual or more frequent installments to the Keswick (Home for Incurable's), of Baltimore City, to be used by it to cover not more than one-half (½) of the cost of such elderly persons enrolled in the Day Care Program operated by Keswick, who do not have financial means to pay all costs thereof. If for any reason Keswick should cease to operate its Day Care Program, or should there be insufficient individuals enrolled therein needing financial assistance to utilize all trust income, then it is my wish that the remaining income or all income, as the case may be, from this fund be used to subsidize a portion of the costs of worthy elderly persons who may benefit from the Domiciliary Care Program operated at Keswick. Again, this subsidy should be offered to persons who do not have sufficient financial means to pay all of the costs thereof. Said home may establish, through a committee appointed by the Director, with the approval of its Board of Trustees, rules and regulations to determine who, and to what extent, deserving persons shall receive benefits of the income from time to time available. The Trustees shall have no responsibility for the application of the income and payment of the net income to said Home as above provided shall exonerate said Trustees from all liability.

Ms. Cuddeback, the testator, died on October 12, 1992, and Ms. Nelson died on October 27, 1993. For the year 1993, petitioner filed a Form 1041, U.S. Income Tax Return for Estates and Trusts, with the Internal Revenue Service Center, Philadelphia, Pennsylvania. For each of the years 1994 through 1998, petitioner filed a Form 990-PF, Return of Private Foundation or Section 4947(a)(1) Nonexempt Charitable Trust Treated as a Private Foundation, with the Internal Revenue Service Center in Ogden, Utah.

On or about September 1, 1999, petitioner filed a Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code, with the Internal Revenue Service at Baltimore, Maryland.  In its Form 1023, petitioner asked that it be recognized as a section 509(a)(3) supporting organization.  It listed Keswick, Parklane, and Bedford as the supported organizations.  The Form 1023 states that Keswick receives 80 percent of petitioner's income, or approximately $26,000 per year, and that Parklane and Bedford each receive 10 percent of petitioner's income, or approximately $3,300 per year.

Along with its Form 1023, petitioner submitted a letter from Keswick's chief financial officer which describes petitioner's participation in Keswick's activities for 1996.  According to the letter, there were "149 participants served in the Adult Day Services Center in 1996", of whom "29 were recipients of Cuddeback funds." The letter states that "Keswick offers grants to needing [sic] participants" in Keswick's "Adult Day Services Center" that defray 40 or 50 percent of the full charge of the program for the participant.  The letter further explains that the first 25 percent of the "grant" is covered by Keswick and the remaining 15 to 25 percent comes

from funds provided by petitioner.  During 1996, 24 participants received a 40-percent grant and 5 received a 50-percent grant, for a total of 29 participants who received funds from petitioner totaling $15,967.

Petitioner later supplemented its Form 1023 upon respondent's request for certain additional information. Set out below is the statement of revenue and expenses that petitioner submitted as part of its Form 1023, as supplemented:

| Statement of revenue and expenses | 1996 | 1997 | 1998 | 1/1/99– 7/31/99 | Total |
|---|---|---|---|---|---|
| Gross investment income | $27,455 | $26,750 | $36,255 | $20,347 | $110,807 |
| Other income, "partnerships" | -0- | -0- | (241) | -0- | (241) |
| Total | 27,455 | 26,750 | 36,014 | 20,347 | 110,566 |
| Gain or loss from sale of capital assets | 18,042 | (7,954) | 150,682 | 210,635 | 371,405 |
| Total revenue | 45,497 | 18,796 | 186,696 | 230,982 | 481,971 |
| Contributions, gifts, grants, & similar amounts paid | | | | | |
| Keswick | 20,291 | 23,585 | 25,631 | 19,114 | |
| Bedford | 2,536 | 2,948 | 3,204 | 2,389 | |
| Parklane | 2,536 | 2,948 | 3,204 | 2,389 | |
| Compensation of officers, directors, & trustees | 3,365 | 3,720 | 4,236 | 10,151 | |
| Other expenses | | | | | |
| Accounting | 1,000 | 1,000 | 1,000 | 1,200 | |
| Publications | 85 | 89 | 100 | 104 | |
| Bank charges | 10 | 114 | 74 | -0- | |
| Total expenses | 29,823 | 34,404 | 37,449 | 35,347 | |
| Excess of revenue over expenses | 15,674 | (15,608) | 149,247 | 195,635 | |

The balance sheet submitted as part of petitioner's Form

1023 is set out below:

| Balance sheet | 7/31/99 |
|---|---|
| Assets | |
| Cash | $197,289 |
| Bonds and notes receivable | 100,500 |
| Corporate stocks | 611,770 |
| Other investments | 17,033 |
| Total assets | 926,592 |
| Liabilities | |
| Total liabilities | -0- |
| Fund balances or net assets | |
| Total fund balances or net assets | (926,592) (sic) |
| Total liabilities and fund balances or net assets | 926,592 |

By letter dated November 16, 1999, respondent

recognized petitioner as an organization described in

section 501(c)(3) but issued a proposed adverse ruling as

to petitioner's private foundation classification.  In

pertinent part, the adverse ruling states as follows:

> Information submitted states the support provided
> by the organization revealed that in 1999 the
> organization distributed 8% percent [sic] of it's
> [sic] income to Kerswick [sic] and 1% percent
> [sic] each to Bedford Park Presbyterian Church
> and Parklane Baptist Church.
>
> You submitted a letter dated March 17, 1997 from
> Keswick in which it states that the grant is of
> a significant benefit to its budget.  However,
> the amount of the grant in comparison to the
> overall annual income of each recipient
> organization far exceeds the gross income and
> net investment income of the trust.  Thus, we
> find that the support provided by the trust is
> not sufficient to ensure the attentiveness of
> the charities to the operations of the organi-

zation, thereby failing the "integral part test" set forth in the regulations. Consequently, your organization does not qualify as a supporting organization within the meaning of section 509(a)(3) of the Code.

Petitioner's attorneys filed a letter with respondent's Office of Appeals appealing the proposed adverse ruling. In the letter, they state that petitioner's support is earmarked by the controlling document to provide "grants associated with Keswick's Adult Day Care Program", that petitioner "provides up to 50 percent of the grant money provided to 100 percent of all grant recipients", that the "Keswick Day Care Program is a substantial program providing day care for 139 adults within the Baltimore Metropolitan area", and "without the funds provided by the Cuddeback Memorial Fund, the grant program would be severely curtailed, and a significant number of individuals would be unable to receive financial assistance in connection with the Adult Day Care Program". The letter further states that, under section 1.509(a)-4(i)(3)(iii)(b), Income Tax Regs., in determining the attentiveness of the beneficiary organization, "the total support for the day care grant program" is substituted for "the total support of the beneficiary organization." On that basis, petitioner's attorneys state "the attentiveness

test is clearly met" and the adverse determination should be reversed.

Petitioner's attorneys submitted a second letter from Keswick dated December 15, 1999.  This letter states that in 1999 there were 139 participants who were served in the adult day services center, of whom 31 or 22 percent received Cuddeback funds because they were persons who "could not afford to pay the full $60.00 per day charge for our [i.e., Keswick's] service."  The letter also states that "grants totaling $27,236 were provided to Keswick participants from the Cuddeback funds during 1999", and it furnishes the following information on how the funds from petitioner were applied:

> Keswick offers grants to eligible participants in the amount of 25%, 40%, 50% and 60% of the program's full charge.  The first 50% of each grant is covered by Keswick.  The remaining 50% comes from Cuddeback funds, thus supplementing our existing grant program.  During 1999 5 participants received a 25% grant, 12 received 40% grants, 7 received 50% and 7 received 60%.

During an Appeals conference on the matter, respondent's representatives asked petitioner's attorneys to submit "the budget for Keswick's Adult Day Care Services for the past three (3) years and also what effect it would have on that program if the Cuddeback funds were no longer available."  In response, petitioner filed a supplement to

its appeal that included a third letter from Keswick dated
June 28, 2000. This letter provides the following "current
financial information" that is labeled "FY 2000 Budget"
and "FY 2000 Actual (Projected)":

|  | FY 2000 budget | FY 2000 actual (projected) |
|---|---|---|
| Gross revenue | $841,517 | $640,775 |
| Direct program costs | 865,682 | 763,544 |
| Indirect costs | 525,693 | 377,024 |
| Excess of cost over revenue | (549,858) | (499,793) |
| Less: charity care | (179,478) | (54,347) |
| Net loss | (729,336) | (554,140) |

The letter does not explain the above financial information
except that it notes that "the Charity Care includes the
funding received from the Cuddeback trust." The letter
also states that

> Without the Cuddeback Trust fund, many of these
> seniors would be placed in a nursing home
> prematurely or left at home alone during the day
> where they could be at risk of injury, missing
> meals and/or medications, and generally feeling
> confused and lost. In addition, Cuddeback funds
> have been used to assist veterans whose benefits
> for medical day care have been exhausted; they
> have assisted families in obtaining services
> quickly until other funding sources could be
> obtained; and the funds have been used as a
> supplement to other funding sources when those
> funds were not adequate. * * *

> In conclusion, without these funds, there
> would be a significant reduction in the number of
> seniors served at Keswick Adult Day, and this
> reduction would affect the overall quality of
> services that are currently being provided.

In due course, respondent determined in a final adverse ruling that petitioner failed to qualify as a nonprivate foundation under section 509(a)(3). According to the final adverse determination letter, the determination is based upon the fact that "You have failed to establish that you meet the requirements for exemption under section 509(a)(3) of the Internal Revenue Code."  In response, petitioner timely filed the instant petition for declaratory judgment with the Court.

## Discussion

The issue for decision in this case is whether petitioner is an organization described by section 509(a)(3), a so-called supporting organization, one type of section 501(c)(3) organization that is excepted from treatment as a private foundation.  See sec. 509(a).  In order to qualify as a supporting organization, an entity must satisfy the three requirements set forth in section 509(a)(3).  Section 509(a)(3) provides, in pertinent part, as follows:

> SEC. 509.  PRIVATE FOUNDATION DEFINED
>
>     (a) General Rule.--For purposes of this
> title, the term "private foundation" means a
> domestic or foreign organization described in
> section 501(c)(3) other than--
>
> *     *     *     *     *     *     *

(3) an organization which--

    (A) is organized, and at all times thereafter is operated, exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more specified organizations described in paragraph (1) or (2),

    (B) is operated, supervised, or controlled by or in connection with one or more organizations, described in paragraph (1) or (2), and

    (C) is not controlled directly or indirectly by one or more disqualified persons (as defined in section 4946) other than foundation managers and other than one or more organizations described in paragraph (1) or (2);
* * *

The above provision was "designed to insure that a supported organization has the ability and motivation to properly oversee the activities of the supporting organization." Cockerline Meml. Fund v. Commissioner, 86 T.C. 53, 65 (1986).

Respondent's determination is based upon petitioner's failure, as to each of the three recipients of Cuddeback funds, to meet subparagraph (B) of section 509(a)(3), which describes the nature and quality of the relationship that must exist between the supporting organization and the supported organization. See generally Quarrie Charitable Fund v. Commissioner, 603 F.2d 1274, 1278 (7th Cir. 1979), affg. 70 T.C. 182 (1978); Cockerline Meml. Fund v. Commissioner, supra at 58; Callahan Scholarship Fund v.

Commissioner, 73 T.C. 626, 632 (1980); Roe Found.

Charitable Trust v. Commissioner, T.C. Memo. 1989-566.  In

order to satisfy section 509(a)(3)(B) the organization must

be one which is:  (1) Operated, supervised, or controlled

by; (2) supervised or controlled in connection with; or (3)

operated in connection with, one or more publicly supported

beneficiary organizations.  See sec. 1.509(a)-4(f)(2),

Income Tax Regs.  According to section 1.509(a)-4(f)(3),

Income Tax Regs., any relationship described in section

509(a)(3)(B) must ensure that

> (i) The supporting organization will be respon-
> sive to the needs or demands of one or more
> publicly supported organizations; and

> (ii) The supporting organization will con-
> stitute an integral part of, or maintain a
> significant involvement in, the operations of
> one or more publicly supported organizations.

Petitioner argues that it satisfies the third rela-

tionship described by section 509(a)(3)(B), the "operated

in connection with" relationship, as to Keswick.  See

generally sec. 1.509(a)-4(i), Income Tax Regs.  Under this

relationship, it is not necessary for one organization to

control the other, or for a third party to control both,

but it is necessary for there to be a sufficient connection

between the two organizations.  Because this is the least

intimate of the three types of relationship, the regulation

imposes a stringent two-part test that must be met in order

to qualify.  See <u>Quarrie Charitable Fund v. Commissioner</u>, <u>supra</u> at 1278 n.5; <u>Roe Found. Charitable Trust v. Commissioner</u>, <u>supra</u>.  Specifically, section 1.509(a)-4(i), Income Tax Regs., provides the following guidance on how to qualify as an "operated in connection with" organization:

> (i) <u>Meaning of "operated in connection with"</u>--
> (1) General rule.  (i) Except as provided in subdivisions (ii) and (iii) of this subparagraph and subparagraph (4) of this paragraph, a supporting organization will be considered as being operated in connection with one or more publicly supported organizations only if it meets the "responsiveness test" which is defined in subparagraph (2) of this paragraph and the "integral part test" which is defined in subparagraph (3) of this paragraph.

Thus, in order to qualify as a supporting organization under the "operated in connection with" relationship, petitioner must satisfy both the responsiveness test and the integral part test prescribed by the regulations.

The responsiveness test, prescribed by section 1.509(a)-4(i)(2), Income Tax Regs., is designed to ensure that the publicly supported organization has the ability to influence the activities of the supporting organization or has the power to compel an accounting from the supporting organization.  See <u>Cockerline Meml. Fund v. Commissioner</u>, <u>supra</u> at 59-60; <u>Roe Found. Charitable Trust v. Commissioner</u>, <u>supra</u>.  Section 1.509(a)- 4(i)(2), Income Tax Regs., describes this test, in part, as follows:

(2) <u>Responsiveness test</u>.  (i) For purposes of
this paragraph, a supporting organization will
be considered to meet the "responsiveness test"
if the organization is responsive to the needs or
demands of the publicly supported organizations
within the meaning of this subparagraph.  In
order to meet this test, either subdivision (ii)
or subdivision (iii) of this subparagraph must be
satisfied.

\*        \*        \*        \*        \*        \*        \*

(iii)(a) The supporting organization is a
charitable trust under State law;

(b) Each specified publicly supported
organization is a named beneficiary under such
charitable trust's governing instrument; and

(c) The beneficiary organization has the
power to enforce the trust and compel an
accounting under State law.

In this case, petitioner is a charitable trust under
the law of the State of Maryland.  Keswick, the publicly
supported organization, is a named beneficiary under the
second codicil, and it has the power to enforce the trust
and compel an accounting under the law of the State of
Maryland.  See Md. Code Ann., Est. & Trusts, sec. 14-301
(2001).  Thus, petitioner meets section 1.509(a)-
4(i)(2)(iii), Income Tax Regs., and, accordingly, meets
the responsiveness test as to Keswick.  See generally
<u>Callahan Scholarship Fund v. Commissioner</u>, <u>supra</u> at 634-
637.  Respondent does not contend otherwise.

The integral part test, prescribed by section
1.509(a)-4(i)(3), Income Tax Regs., is designed to ensure
that the supporting organization maintains a significant

involvement in the operations of one or more publicly supported organizations and that such publicly supported organizations are in turn dependent upon the supporting organization for the type of support which it provides. See sec. 1.509(a)-4(i)(3)(i), Income Tax Regs. In effect, the integral part test ensures that the supported organization will have the motivation to be attentive to the activities of the supporting organization. See Callahan Scholarship Fund v. Commissioner, 73 T.C. at 638.

There are two alternate ways to satisfy the integral part test. Section 1.509(a)-4(i)(3)(ii), Income Tax Regs., describes the first method as follows:

> (ii) The activities engaged in for or on behalf of the publicly supported organizations are activities to perform the functions of, or to carry out the purposes of, such organizations, and, but for the involvement of the supporting organization, would normally be engaged in by the publicly supported organizations themselves.

Thus, under this first method, the supporting organization must actually engage in activities for or on behalf of the publicly supported organization.

Petitioner does not engage in any activities on behalf of Keswick, other than distributing funds to Keswick, and, thus, does not claim to satisfy the first method of complying with the integral part test, as described by section 1.509(a)-4(i)(3)(ii), Income Tax Regs.

The second method of satisfying the integral part test is described by section 1.509(a)-4(i)(3)(iii), Income Tax Regs., as follows:

(iii)(a) The supporting organization makes payments of substantially all of its income to or for the use of one or more publicly supported organizations, and the amount of support received by one or more of such publicly supported organizations is sufficient to insure the attentiveness of such organizations to the operations of the supporting organization. In addition, a substantial amount of the total support of the supporting organization must go to those publicly supported organizations which meet the attentiveness requirement of this subdivision with respect to such supporting organization. Except as provided in (b) of this subdivision, the amount of support received by a publicly supported organization must represent a sufficient part of the organization's total support so as to insure such attentiveness. In applying the preceding sentence, if such supporting organization makes payments to, or for the use of, a particular department or school of a university, hospital or church, the total support of the department or school shall be substituted for the total support of the beneficiary organization.

(b) Even where the amount of support received by a publicly supported beneficiary organization does not represent a sufficient part of the beneficiary organization's total support, the amount of support received from a supporting organization may be sufficient to meet the requirements of this subdivision if it can be demonstrated that in order to avoid the interruption of the carrying on of a particular function or activity, the beneficiary organization will be sufficiently attentive to the operations of the supporting organization. This may be the case where either the supporting organization or the beneficiary organization earmarks the support received from the supporting organization for a particular program or activity, even if such program or activity is not the beneficiary organization's primary program or

activity so long as such program or activity is a substantial one.

Thus, the supporting organization must satisfy three criteria or prongs. First, the supporting organization must make payments of substantially all its income to or for the use of one or more publicly supported organizations. See sec. 1.509(a)-4(i)(3)(iii)(a), Income Tax Regs. We refer to this as the substantially all prong. Second, the amount of support received by one or more publicly supported organizations must be "sufficient to insure the attentiveness of such organizations to the operations of the supporting organization". Id. We refer to this as the attentiveness prong. Third, a substantial amount of the total support of the supporting organization must go to those publicly supported organizations which meet the attentiveness prong with respect to the supporting organization. Id. We refer to this as the substantial amount prong.

In applying the attentiveness prong of the integral part test, the regulations state that the amount of support received by the publicly supported organization must represent "a sufficient part" of the total support received by the publicly supported organization. Id. In making this determination, if the supporting organization makes payments to a particular department or school of a university, hospital, or church, the regulations provide

that the amount of support received by the publicly supported organization must represent a sufficient part of the total support of the department or school, rather than the total support of the entire organization. Id.

Furthermore, the regulations provide that, even if the amount of support received by the publicly supported organization does not represent a sufficient part of the organization's total support, the support received by the publicly supported organization nevertheless may be sufficient. Sec. 1.509(a)-4(i)(3)(iii)(b), Income Tax Regs. According to the regulations, this may be true if it can be demonstrated that the beneficiary organization will be attentive to the supporting organization "in order to avoid the interruption of the carrying on of a particular function or activity", such as where the payments are earmarked for a particular program or activity which may not be the primary program or activity of the beneficiary organization but is "a substantial one." Id.

Finally, the regulations provide that all pertinent factors will be considered in determining whether the attentiveness prong is satisfied; that is, whether the amount of support received by a publicly supported organization is sufficient to ensure the attentiveness of that organization to the operations of the supporting organization. See sec. 1.509(a)-4(i)(3)(iii)(d), Income Tax Regs. The pertinent factors enumerated by the

regulations are the length and nature of the relationship between the beneficiary and supporting organization, the purpose to which the funds are put, the amount of the support as a percentage of the total support of the publicly supported organization, and evidence of actual attentiveness by the beneficiary organization. Id.

Petitioner's position is that it satisfies the "integral part test" prescribed by section 1.509(a)-4(i)(3)(iii), Income Tax Regs., and, therefore, should be considered as being "operated in connection with" Keswick for purposes of determining whether it is a supporting organization under section 509(a)(3)(B). In applying the integral part test, petitioner argues that its support to Keswick is earmarked "for a particular program or activity, that being the application of the Trust funds for the purpose of making the Day Care Program of the supported organization available to those qualified individuals unable to pay the full cost of the day care tuition."

According to petitioner, Keswick's letters show that "Fifty Percent of all grants coming from the grant program came from the funds distributed to Keswick by the Trust (i.e. petitioner)." Petitioner argues:

> Fifty percent of all funds utilized by the grant program constitutes a sufficient part to insure attentiveness. To reduce by one half, the number of recipients of grants would severely impair the existing grant program and cause a discontinuance

of service to at least one half of needy grant recipients, the ultimate beneficiaries served.

Thus, petitioner bases its argument that Keswick will be sufficiently attentive to petitioner's operations in order to prevent an "interruption" in the grant program on the fact that it contributes 50 percent of the discount offered by Keswick to certain participants in the daycare program and on the supposition that 50 percent of those recipients would be unable to participate in the program if petitioner's funds were not available.  In this connection, petitioner argues that the term "interruption", simply means conducting the program in a different manner or degree rather than a complete cessation of the program.

Petitioner also argues that the grant program "is certainly substantial in relation to the adult day care program."  In this connection, petitioner points out that, of the 139 individuals who were served in the adult daycare program in 1999, "22% received grants".  Petitioner also points out that the amount contributed in 1999 was $27,236, "not an unsubstantial sum".

Finally, petitioner argues that the factors for determining attentiveness which are enumerated in section 1.509(a)-4(i)(3)(iii)(d), Income Tax Regs., weigh heavily in its favor.  Petitioner points out that it has made distributions to Keswick for 7 years and that such distributions provide 50 percent of all grants.  According

to petitioner, this "shows a great likelihood that the degree of attentiveness * * * required by the regulation will be present."  Petitioner also argues that Keswick's correspondence shows its "attentiveness to and reliance upon the supporting organization".  Lastly, petitioner points out that under section 6104(d) Keswick is entitled to obtain a copy of petitioner's annual return, which shows a detailed listing of all of petitioner's investments and its investment return.

Respondent's position is that petitioner is not a supporting organization because it has not shown that it has a relationship with Keswick or any other publicly supported organization described by section 509(a)(3)(B).  Specifically, respondent contends that petitioner is not "operated in connection with" Keswick or any other publicly supported organization because petitioner does not meet the "integral part test" described by section 1.509(a)-4(i)(3)(iii), Income Tax Regs.

Respondent agrees that petitioner's support is earmarked for a particular program or activity of Keswick, raising a question whether the exception for earmarked funds, section 1.509(a)-4(i)(3)(iii)(b), Income Tax Regs., is applicable.  Contrary to petitioner's contention, respondent argues that petitioner has not made the showing, required under section 1.509(a)-4(i)(3)(iii)(b), Income Tax Regs., that Keswick would be sufficiently attentive to the

operations of petitioner in order to avoid the interruption of the carrying on of a particular program or activity. Respondent's argument is premised on the assertion that there is "no evidence, other than petitioner's self-serving statements, that there exists a separate adult daycare grant program." According to respondent, petitioner's funds are earmarked for Keswick's adult daycare program, not for any grant program.

Respondent also argues that the adult daycare program is not a substantial activity for Keswick, but, even if it were, there is no evidence that the loss of petitioner's funds would cause Keswick to interrupt or discontinue the adult daycare program. To the contrary, respondent states that for fiscal year 2000 petitioner's support represented only 4.25 percent of Keswick's budget for the adult daycare center. Respondent also points out that during 1999, when the amount of Cuddeback funds used to provide grants increased by $11,269, an increase of more than 70 percent over the amount used during 1996, the adult daycare program served 10 fewer participants (i.e., 149 in 1996 and 139 in 1999) and only 2 additional individuals received "grants". Respondent further argues that petitioner's support can be used, and was used in 1996, for purposes other than the adult daycare program. Respondent concludes from these facts that the adult daycare program does not depend on petitioner's support and, without such support,

the program would not be interrupted or discontinued.

Respondent also argues, on the basis of the examples set forth in section 1.509(a)-4(i)(3)(iii)(c), Income Tax Regs., that the term "interruption" in section 1.509(a)-4(i)(3)(iii)(b), Income Tax Regs., should be interpreted to mean discontinuance.  In effect, respondent argues that a publicly supported organization will not be attentive to the operations of the supporting organization unless the loss of support from that organization will cause the discontinuance of a particular program or activity, rather than causing the program to be conducted in a different manner or degree.

The dispute between the parties in this case involves the question whether it is demonstrated in the administrative record "that in order to avoid the interruption of the carrying on of a particular function or activity, the beneficiary organization [i.e. Keswick] will be sufficiently attentive to the operations of the supporting organization [i.e. petitioner]."  See sec. 1.509(a)-4(i)(3)(iii)(b), Income Tax Regs.  It also involves whether the particular program or activity for which the support is earmarked is a "substantial" program or activity.  See id.

While the parties agree that petitioner's support to Keswick is earmarked, they disagree about whether the support is earmarked for the adult daycare program or for a program to provide grants to needy participants in that

program.  They also disagree about the meaning of the term "interruption" as used in the regulation.  Finally, they disagree about whether the adult daycare program or the grant program is a "substantial" program or activity of Keswick, as required by section 1.509(a)-4(i)(3)(iii)(b), Income Tax Regs.

On the basis of our review of the administrative record, we do not believe that it has been demonstrated that Keswick will be sufficiently attentive to petitioner's operations in order to avoid an "interruption" of either the adult daycare program or a program to provide grants to needy participants in that program.  Furthermore, while the daycare program with "Actual (Projected)" revenues of $640,775 and direct and indirect costs of $1,140,568 in fiscal year 2000 appears to be a substantial program, there is not sufficient information in the administrative record to make the same finding about the grant program.

The information about Keswick in the administrative record of this case is sketchy.  We know that Keswick conducts a domiciliary nursing care program which is its primary program or activity, and we know that it conducts a daycare program through its adult day services center. The record provides little or no specific information about the domiciliary program, such as how many individuals are served by the program, what services are provided to participants in the program, what revenues are realized

by the program, what its expenses are, or any other information.

The information about Keswick in the administrative record is focused on the adult day services program and the "grants" provided to needy participants. However, even here, the information in the administrative record is sketchy. For 1996, the administrative record shows that petitioner contributed $20,291 to Keswick, and that $15,967 was given to grant recipients from funds that petitioner had contributed. For 1999, the record shows that petitioner contributed $19,114 to Keswick through July 31, 1999, and that $27,236 was given to grant recipients during the year from funds that petitioner had contributed. We are told the number of participants in the adult day services program, 149 participants in 1996 and 139 participants in 1999, and the number of such participants who received "grants", 29 in 1996 and 31 in 1999. Significantly, we are not given any revenue or cost information for those years. For 1999, we are told that Keswick charged $60 per day for the services it provided to participants in the adult day services program, but we are not told the amount of the charge for any other year.

For the years 1997 and 1998, the administrative record shows that petitioner contributed $23,585 and $25,631 to Keswick, respectively. However, the administrative record

provides no other information concerning Keswick's daycare program or grant program during either of those 2 years.

For fiscal year 2000, the administrative record contains certain financial information regarding the adult day services program and the cost of certain "charity care" that "includes the funding received from the Cuddeback trust". Significantly, we are not given the number of participants in the program or the number of grant recipients during that year. We are not told the amount that petitioner contributed to Keswick or the amount of grants provided by petitioner's funds. We are not even told the end of Keswick's fiscal year.

Furthermore, the financial information for fiscal year 2000 regarding the daycare program shows that Keswick received gross revenue of $640,775 and incurred direct and indirect costs of $1,140,568, and that Keswick's costs exceeded revenue by $499,793. Thus, it appears that Keswick's charges for the services that it provided to participants in the program were not sufficient to offset the costs incurred. The financial information also suggests that if "charity care" of $54,347 were removed, then the excess of cost over revenue would increase to $554,140.

The administrative record shows that Keswick discounts the cost of its daycare program for certain needy individuals. Keswick refers to these discounts as "grants", and it refers to this grant program as "charity care". For example, in 1999, Keswick offered discounts of 25, 40, 50, and 60 percent of the full charge of the program, $60 per day. Thus, in 1999, the value of the "grant" or discount of Keswick's charge to each recipient ranged from $15 to $36 per day. During that year, 5 participants received a 25-percent grant, 12 received a 40-percent grant, 7 received a 50-percent grant, and 7 received a 60-percent grant, for a total of 31 grant recipients.

On an annual basis, the value of the "grant" extended to one recipient in each "grant" category would be $38,325, and the value of the "grant" for all 31 recipients would be $301,125, as shown below:

| 1999 Type of "grant" percent | No. of recipients | Daily "grant" per recipient (at $60) | Annual "grant" per recipient | Annual "grants" for all recipients |
|---|---|---|---|---|
| 25 | 5 | $15 | $5,475 | $27,375 |
| 40 | 12 | 24 | 8,760 | 105,120 |
| 50 | 7 | 30 | 10,950 | 76,650 |
| 60 | 7 | 36 | 13,140 | 91,980 |
| Total | 31 | | 38,325 | 301,125 |

The portion of the grants from petitioner's funds, $27,236, is small in relation to the value of the grants on an annual basis, computed above. The record does not provide the number of days each of the 31 grant recipients participated in the program during 1999, but, clearly, it was much less than a full year, at least on an overall basis.

With respect to the daycare program, we are not told what "services" Keswick provides to participants in the program or what costs Keswick incurs in providing such services. We are not given any information concerning the relationship between the domiciliary program and the daycare program, such as whether the two programs use the same buildings or other facilities, whether they share the same staff, etc. We know the number of participants in the daycare program in 1996 and 1999 (viz, 149 and 139, respectively), but we do not know the number of days that they participated in the program. The administrative record does not provide sufficient information to evaluate the financial impact of the daycare program on Keswick.

With respect to the grant program, the record does not explain how participants are made aware of the grant program, and whether participants must apply to receive a grant. The record does not explain how participants are selected to receive a grant, other than the fact that each recipient must be a person who "could not afford to pay the

full $60.00 per day charge for our service".  Similarly, the record does not explain how recipients are selected for a particular grant category; that is, why one recipient receives a 25-percent grant and another receives a 60-percent grant.  The record does not state whether participants are ever turned down for a grant, or whether individuals may be denied "grants" in one category but awarded a smaller "grant".  Finally, the record does not state Keswick's out-of-pocket cost of providing such "grants" or discounts.  In short, on the basis of the information provided in the administrative record, we are unable to fully evaluate the financial impact on Keswick of providing the grants to participants in the daycare program, and we are unable to evaluate the impact on that program of the loss of the funds contributed by petitioner.

Our difficulty in evaluating the impact of petitioner's funds is further complicated by the fact that the administrative record suggests that there are other funding sources for the grant program.  In describing how petitioner's funds are used to defray 50 percent of each of the 31 grants for 1999, Keswick's letter states that the Cuddeback funds are "thus supplementing our existing grant program."  Keswick's letter regarding the use of Cuddeback funds in 1996 makes the same statement.  Thus, it appears that the grant program is not funded entirely by petitioner.  This is confirmed by Keswick's letter of

June 28, 2000, which states that "Cuddeback funds have been used to assist veterans whose benefits for medical daycare have been exhausted"; they have been used as a ready source of funds to assist families "until other funding sources could be obtained"; and they have been used "as a supplement to other funding sources when those funds were not adequate." Furthermore, the financial information for FY 2000 shows a budget for "charity care" of ($179,478) and "Actual (Projected)" charity care of ($54,347). According to Keswick's letter, those amounts include "the funding received from the Cuddeback trust", but the letter does not further explain what those figures are. The existence of other funding sources suggests that Keswick's grant program may not depend on petitioner's contributions, and it casts doubt on petitioner's assertion that "50% of the total grants were supplied by Petitioner's distribution".

As mentioned above, petitioner's argument that Keswick will be attentive to its operations is premised on the assertion that it provides 50 percent of the funds for all "grants". We do not believe that that assertion is established by the administrative record. First, there is no showing in the administrative record that 50 percent of Keswick's grants were made with funds from petitioner for 1996, 1997, 1998, or 2000. Second, even for 1999, we do not agree that the administrative record shows that 50 percent of all grants given by Keswick were made with

petitioner's funds. Petitioner bases that assertion on Keswick's letter which states that of the 31 grants made in 1999, the first 50 percent of each grant is covered by Keswick and "the remaining 50 percent comes from Cuddeback funds". However, none of Keswick's letters states that petitioner provided 50 percent of all grants given by Keswick during the year or that petitioner provided 50 percent of Keswick's charity care for the year. To the contrary, as mentioned above, Keswick's letters state that it had "other funding sources." We do not know what other funding sources Keswick had, and we do not know the full extent of Keswick's charity care. Therefore, we cannot evaluate the relative importance of the funds provided by petitioner or whether the loss of petitioner's funds would cause an "interruption" of any kind in Keswick's grant program.

Moreover, even if we were to accept petitioner's assertion that "50% of the total grants were supplied by Petitioner's distribution", we question whether that would assure Keswick's "attentiveness". Keswick's financial information for fiscal year 2000 shows that it sustained a loss from the daycare program of $499,793 (gross revenue of $640,775 less direct and indirect costs of $1,140,568). Thus, it appears that the $60 per day charge was well below the cost of the program and is an artificial measure of the importance of petitioner's support. On the other hand, if

the amount of grants provided from petitioner's funds during 1999, $27,236, is compared to the loss, it appears that petitioner's funds amount to only 5.44% of the loss, a level that does not assure "attentiveness".

In addition, we disagree with petitioner's argument that the grant program, as funded by petitioner, is substantial because 22 percent of the 139 daycare participants received Cuddeback funds during 1999. Petitioner computed this percentage by dividing the number of grant recipients for 1999, 31, by the number of daycare participants for the year, 139. This percentage does not show the relative importance of such grants to the daycare program. It fails to take into account the number of days each "grant" recipient participated in the daycare program and it treats all "grant" recipients equally, whether they receive a 25-, 40-, 50-, or 60-percent "grant".

Finally, we reject petitioner's contention that the factors contained in section 1.509(a)-4(i)(3)(iii)(d), Income Tax Regs., weigh heavily in its favor. First, as explained above, due to the sketchiness of the information regarding other sources of funds for Keswick's grant program, we cannot conclude that the percentage of support from petitioner is sufficient to ensure Keswick's attentiveness to avoid interruption of the grant program. Second, we disagree with petitioner's suggestion that Keswick's letters demonstrate its attentiveness to

petitioner.  Finally, we disagree with petitioner's suggestion that attentiveness is demonstrated by the fact that petitioner is required by section 6104(d) to make available for inspection by any individual its annual tax return and certain other information, such as investment return and a listing of all investments.  In this case, there is no evidence that Keswick exercised actual attentiveness to petitioner's operations.

For the reasons discussed above, we affirm respondent's determination that petitioner fails to satisfy the attentiveness prong of the integral part test of section 1.509(a)-4(i)(3), Income Tax Regs., and that petitioner does not qualify to be excepted from private foundation status under section 509(a)(3).

<u>Decision will be entered</u>

<u>for respondent</u>.